```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF OHIO
                       EASTERN DIVISION
```

United States of America

    v.                                Case No. 2:13-cr-253

Donald C. Jessie

<u>MEMORANDUM OPINION AND ORDER</u>

    In an initial revocation petition dated May 26, 2015, the probation officer reported that defendant violated the conditions of his supervised release by committing another offense, specifically, domestic violence consisting of defendant's alleged assault of his wife, Tyra Whitlow, on April 3-4, 2015.  In an amended violation report dated June 22, 2015, the probation officer reported additional violations, including: 1) the May 9, 2015, shooting of Changler Amilcar by the defendant; 2) defendant's failure to submit a monthly report for May 2015; 3) defendant's failure to maintain employment since March, 2015; 4) a positive urine screen for Oxycodone on February 26, 2015; and 5) defendant's failure to notify his probation officer within seventy-two hours of his arrest for felonious assault on June 10, 2015.  The state court domestic violence and felonious assault charges were later dismissed due to the failure of the witnesses to appear.

    This matter came before the court for a hearing on August 26, 2015, on the probation officer's petition for revocation of defendant's supervised release.  The government called as witnesses Probation Officer Ed Boone, the defendant's probation officer, Amilcar, and Columbus Police Detective Delbert Chapman and Officer Don Olson, who took statements from witnesses and authored the police reports regarding the shooting incident involving Amilcar.

The government also produced police reports and a tape of the 911 calls regarding the assault of Amilcar and police reports concerning the domestic violence charge involving Whitlow. Defendant admitted the violations concerning the failure to maintain employment and the positive drug test, but contested the other violations. Defendant objected to the admission of hearsay evidence. The court, after reviewing the police reports, concluded that the government had made a preliminary showing that the hearsay in the reports was reliable and had offered an explanation for the nonappearance of the witnesses. The court permitted the government to present its case while withholding a final ruling on the admissibility of the hearsay evidence.

I. Standards for Admission of Hearsay Evidence

The Sixth Circuit has held that the Sixth Amendment right of confrontation does not apply to hearings concerning the revocation of supervised release. United States v. Kirby, 418 F.3d 621, 628 (6th Cir. 2005). Hearsay evidence is admissible in revocation hearings if it is reliable. Id. (holding that probation officer could testify to out-of-court statements made by victims and police officers because the evidence was reliable); United States v. Stephenson, 928 F.2d 728, 732 (6th Cir. 1991).

Nonetheless, under Fed. R. Crim. P. 32.1(b)(2)(C), the defendant is entitled to "an opportunity to ... question any adverse witness unless the court determines that the interest of justice does not require the witness to appear[.]" Rule 32.1(b)(2)(C). The Advisory Committee Notes explain that in applying Rule 32.1(b)(2)(C), the court is to balance the person's interest in confronting the declarants against the government's

good cause for denying confrontation.  Thus, the "'flexible evidentiary standard that applies to revocation proceedings allows consideration of evidence that would be inadmissible in a criminal prosecution,'" but it does not strip the defendant of all protections." United States v. Jackson, 422 F.App'x 408, 411 (6th Cir. 2011)(quoting United States v. Whitely, 356 F.App'x 839, 843 (6th Cir. 2009)).  However, Rule 32.1 only applies to hearsay evidence which would ordinarily be inadmissible in a criminal trial.  See United States v. Williams, 443 F.3d 35, 45 (2d Cir. 2006)("Neither the Due Process Clause nor Rule 32.1 obliges the district court to perform a good-cause analysis with respect to a 'proffered out-of-court statement [that] is admissible under an established exception to the hearsay rule.'")(quoting United States v. Aspinall, 389 F.3d 332, 344 (2d Cir. 2004)).

   The balancing test in Rule 32.1(b)(2)(C) requires the court to consider the government's reasons for offering hearsay and the defendant's interest in confronting adverse witnesses.  United States v. Jordan, 742 F.3d 276, 279 (7th Cir. 2014).  The reliability of the hearsay evidence is also a critical factor in the balancing test.  United States v. Doswell, 670 F.3d 526, 531 (4th Cir. 2012); see also Jordan, 742 F.3d at 280 (the reliability of the evidence and availability of corroborating evidence or witnesses may be relevant in determining whether to admit hearsay evidence).  If the hearsay evidence is reliable, this weakens the defendant's interest in confrontation.  United States v. Mosley, 759 F.3d 664, 668 (7th Cir. 2014); Curtis v. Chester, 626 F.3d 540, 547 (10th Cir. 2010)(where hearsay statements are supported by other sources, defendant has a diminished interest in testing those

statements through confrontation). However, even if the hearsay is reliable, the balancing process still requires the government to offer a reason for not producing the witness. Mosley, 759 F.3d at 668; United States v. Johnson, 710 F.3d 784, 789 (8th Cir. 2013)(the court should assess the explanation the government offers as to why confrontation is undesirable or impractical and the reliability of the evidence the government offers in place of live testimony); Williams, 443 F.3d at 45 (the court must balance the defendant's interest in confrontation against the government's reasons for not producing the witness and the reliability of the proffered hearsay). "If the hearsay evidence is reliable and the government has offered a satisfactory explanation for not producing the adverse witness, the hearsay evidence will likely be admissible under Rule 32.1." Doswell, 670 F.3d at 531.

II. Government's Reasons for Not Producing Witnesses

Probation Officer Ed Boone testified that on May 14, 2015, he spoke with Tyra Whitlow, defendant's wife and the victim of the domestic violence charge, and obtained a statement from her concerning the incident. Officer Boone testified that he also spoke with Whitlow on June 12, 2015. Whitlow told Officer Boone that she was working things out with her husband and would not be pursuing charges. Officer Boone was advised by Assistant Prosecutor Mantel that he had not had contact with the victim and he would not be going forward with the prosecution. Officer Boone testified that the domestic violence case was dismissed, and that he had been unable to get in touch with the victim.

The government attempted to serve a subpoena on Tyra Whitlow but could not obtain personal service. Deputy Marshal Craig Martin

left a copy of the subpoena with Whitlow's brother on Monday, September 24, 2015, two days before the hearing scheduled in the instant case. Whitlow's brother stated that Whitlow lived at the residence, but that she would be at work until 5:00 p.m. Deputy Marshal Martin saw movement at a window of the residence on that date and thought that Whitlow might be in the residence, but he did not actually see her. Deputy Marshal Martin returned to the residence at 6:30 p.m. the next day and left another copy of the subpoena with Whitlow's mother. See Doc. 26. Whitlow's mother stated that Whitlow occasionally stayed there but that she was not at home. Whitlow's brother and mother would not tell Deputy Marshal Martin where Whitlow was working and would not give him her phone number. Whitlow did not appear at the hearing.

The government served a subpoena on Changler Amilcar, the victim of the assault on May 9, 2015. After initially refusing to come into the courtroom, Amilcar eventually testified and was thus available for cross-examination concerning his previous statements to the police concerning the incident. The government also attempted to serve Amilcar's girlfriend, Ebony Wharton, who was another witness in the assault case. Deputy Marshal Martin left a subpoena for Wharton with Amilcar at Wharton's residence on two occasions, but Wharton failed to appear at the hearing. Detective Delbert Chapman of the Columbus Police Department, the officer who investigated the assault against Amilcar, testified that the assault case was not presented to the grand jury because the victim and witnesses did not appear despite several attempts to contact them. Officer Boone testified that he went to the residence and attempted to talk with the victim and witnesses, but was

5

unsuccessful, and his calls were not returned.

Courts have held that the government established good cause for not producing the victim at the hearing where the victim could not be located despite the government's efforts. See Curtis, 626 F.3d at 548; United States v. Hall, 419 F.3d 980, 988 (9th Cir. 2005). Good cause has also been found where the victim or witness refused to testify. See United States v. Carthen, 681 F.3d 94, 100-01 (2d Cir. 2012)(noting that victim's desire not to testify was not an unusual reaction by a victim of domestic abuse); United States v. Martin, 382 F.3d 840, 846 (8th Cir. 2004). As the Ninth Circuit stated in Hall, "The difficulty of securing the testimony of domestic violence victims ... against their batterers is well recognized." Hall, 419 F.3d at 988, n. 6 (also noting that the most common reason for dismissal of domestic violence crimes is non-cooperation of victims). Good cause justifying the absence of a declarant also exists "when a defendant has a 'history of violent conduct [that] ma[kes] reprisal against [the declarant] a possibility.'" Carthen, 681 F.3d at 101 (quoting United States v. Jones, 299 F.3d 103, 113 (2d Cir. 2002)).

Here, the government attempted to subpoena Whitlow and Wharton for the hearing, but those witnesses failed to appear. The evidence presented by the government indicates that Whitlow, like many domestic violence victims, was likely avoiding service of process due to her fear of the defendant and her desire to save their marriage. It is also likely, in light of the violent nature of the assault she witnessed, that Wharton was not cooperative or responsive to the subpoena due to her fear of possible reprisal by the defendant. The presentence report prepared in connection with

defendant's sentencing for a drug offense in this case indicates that defendant has a history of violent conduct which would make reprisal against the declarant a possibility. Defendant was given a two-level enhancement for possession of a firearm during the commission of the drug offense. PSR, ¶ 106. The defendant admitted using a firearm during the course of the drug conspiracy to kill Adorian Peoples and wound Rummell Heller, see PSR ¶¶ 73-84, although the state charges based on this conduct were dismissed based on defendant's claim of self defense. Defendant also has two prior arrests for domestic assault in 2003 and 2004. PSR ¶¶ 125, 126.

The court finds that the government has shown good cause for not producing Whitlow, Wharton, and the other witnesses to the Amilcar assault at the hearing.

III. Reliability of the Evidence

A. 911 Calls Relating to Assault on May 9, 2015

The Confrontation Clause is implicated by testimony, defined as a "solemn declaration or affirmation made for the purpose of establishing or proving some fact" which may take the form of a formal statement to law-enforcement officers. Crawford v. Washington, 541 U.S. 36, 51-52 (2004). "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." Davis v. Washington, 547 U.S. 813, 822 (2006).

In Davis, the Supreme Court concluded that the 911 call was not testimonial where the caller was facing an ongoing emergency and was seeking help against a bona fide physical threat, and where

the elicited statements were necessary to resolve the present emergency by identifying the assailant so that the officers would know if they were dealing with a violent felon.  Id. at 827-828; see also United States v. Common, 563 F.App'x 429, 434-45 (6th Cir. 2014)(statements made during 911 call were not testimonial in nature because they were made to assist the police in responding to a dangerous situation, namely, a man in possession of a gun, while the caller faced an ongoing emergency).  The formality of the interview or conversation is a factor to be considered.  Davis, 547 U.S. at 828 (noting the difference between the formality of a station house interview, which is more suggestive of a testimonial purpose, and the frantic answers provided over the phone by the 911 caller from a hectic environment).  In Michigan v. Bryant, 562 U.S. 344, 373 (2011), the Supreme Court recognized that an emergency "does not last only for the time between when the assailant pulls the trigger and the bullet hits the victim."  The Court held that the emergency in Bryant was ongoing where the police did not know the location of the shooter or whether the shooter might return to the scene and begin shooting again, thereby posing a danger to the victim, police or the public.  Id. at 374-377.

In the first 911 call from 856 Leona Avenue, made at 10:42 p.m. on May 9, 2015, the caller reported that someone had just shot her son at the front door of the residence, and that he was bleeding badly.  The caller did not identify herself by name.  However, the police report includes the summary of an interview of Karen Sliker, who identified herself as the mother of Ebony Wharton, Amilcar's girlfriend, which took place on May 9, 2015, at 11:39 p.m. at the Leona Avenue address.  The reference to "son"

8

could conceivably include "son-in-law." The dispatcher asked who shot the victim. The caller, talking to someone at the residence, asked "What's his name?" At that point, another person, apparently Whitlow, took the phone (the police report includes a summary of an interview with her at 12:04 p.m. on May 10, 2015). Whitlow told the dispatcher that the shooter was "Donald Jessie," then stated, "Could you just get here, the man's going to die." The dispatcher stated that he was trying to get information for the officers and a description so that they could stop him. Whitlow stated that the shooter was 5'6" and had a beard, and that he was her husband. When asked for defendant's race, she responded that he was black, and that he was wearing a light shirt and shorts. The dispatcher asked which way the shooter left, and Whitlow responded that he left in a silver Toyota truck, but that she did not know which way he went, as they shut the door on him. Whitlow stated again, "He's my husband, I have a restraining order against him." She stated that they were getting a divorce. The dispatcher asked again if it was her husband who shot the victim, and she responded that it was. The dispatcher asked who was shot, and she responded that it was her best friend's boyfriend. During this call, other people were talking excitedly in the background.

Another 911 caller from the Leona Avenue address stated that her brother had just been shot. This call was received at 10:43 p.m. Although the female caller does not identify herself, the police report includes the summary of an interview of Sarafinah Wharton, who identified herself as Amilcar's sister, which took place at 12:11 a.m. on May 10, 2015, at 856 Leona Avenue. The caller reported hysterically that her brother was shot in the leg

and that he was bleeding a lot. She stated that she was in the house and did not see the shooter. After the dispatcher put the call through to the fire department, the caller reported that her sister was driving the victim to the hospital.

The court finds that these 911 calls are admissible as non-testimonial statements which do not implicate any confrontation rights. The purpose of the calls from the standpoint of the callers was to obtain medical help for Amilcar, an ongoing emergency. The dispatchers' questions were for the purpose of gathering information needed to for the officers to address the ongoing emergency presented by the shooting and their pursuit of a dangerous assailant in possession of a firearm who could pose a danger to the officers and the public. Although defendant had left the scene of the shooting, the witnesses and the dispatchers had no assurance at that point that defendant would not return and continue his attack. That was certainly a possibility in this case, as the incident was sparked by Whitlow's refusal to leave with defendant, and Whitlow remained at the scene.

In the alternative, the court finds that the witnesses' statements on the 911 call fall within the "excited utterance" exception to the hearsay rule. An "excited utterance" is "[a] statement relating to a startling event or condition, made while the declarant was under the stress of the excitement that it caused." Fed.R.Evid. 803(2). The requirements for an "excited utterance" are: 1) an event startling enough to cause nervous excitement; 2) the making of the statement before there was time to contrive or misrepresent; and 3) the making of the statement while the person is under the stress of the excitement caused by the

10

event. United States v. Arnold, 486 F.3d 177, 184 (6th Cir. 2007). The statement need not be made during the course of the startling event. Id. at 185. Rather, it is only necessary that the declarant still appeared nervous or distraught and that there was a reasonable basis for continuing to be emotionally upset. United States v. Overton, 600 F.App'x 303, 308 (6th Cir. 2014). In this case, the 911 callers reported a traumatic event, the shooting of Amilcar, which had occurred minutes before the call, and made the statements before there was time to contrive or misrepresent, while still in a distraught condition.

The court also finds that the statements made during the 911 calls were reliable. Whitlow's statements during the 911 call identifying her husband, the defendant, as the shooter, were not likely contrived because she was under the stress of excitement from the shooting when the statements were made. See United States v. Dobson, 529 F.App'x 536, 539 (6th Cir. 2013). Her 911 call statements are consistent with her police interview later that night. See Dobson, 529 F.App'x at 539 (multiple consistent statements by victim can be an indication of reliability). Whitlow's statements are corroborated by the interview statements of Ebony Wharton and Amilcar. Although defendant denied being the shooter, he admitted that he was at the Leona Avenue residence at the time of the shooting to pick up Whitlow, and that he left in his Toyota Forerunner because he did not want to be there when the police arrived.

B. Other Statements Regarding May 9, 2015, Assault

The witness statements in the police reports concerning the shooting of Amilcar are consistent and corroborate each other. As

11

indicated above, Whitlow identified defendant as the shooter both during the 911 call and during her interview by the police. Multiple consistent statements by the same declarant are an indication of reliability. Dobson, 529 F.App'x at 539. Whitlow reported that she was separated from defendant due to some physical abuse issues. She stated that after attending her uncle's funeral, she and Ebony Wharton went to the Jefferson Outlet Mall. She left her phone in the car of Ebony's mother. Defendant was upset because he had been calling her all day. When defendant arrived, he was talking in a tone of voice that scared her. Amilcar stepped onto the porch, and defendant pulled out a gun and shot him in the leg.

Hearsay may be considered reliable if it is supported by corroborating evidence. United States v. Lloyd, 566 F.3d 341, 345 (3d Cir. 2009); United States v. Moncivais, 492 F.3d 652, 659 (6th Cir. 2007)(hearsay was reliable because it was both internally and externally consistent"). Whitlow's statements are corroborated by those of Ebony Wharton, Just as Wharton's statements are corroborated by those of Whitlow. Wharton was questioned by Officer Olson, after he intercepted her vehicle as she was transporting Amilcar to the hospital. While under the stress of this traumatic event, Wharton reported that the shooter's name was "Blue" and that he was her friend's "babies dad." She reported that after Amilcar and the victim began arguing, "Blue" pulled out a gun and shot him. Ebony Wharton was also interviewed later that night by Detective Chapman. She stated that Whitlow was separated from the defendant, and that she was planning on divorcing him. Wharton verified that she and Whitlow had spent the day together

12

going to a funeral and the mall. She stated that when defendant arrived at the residence, he and Amilcar had a conversation about a fake video, and defendant pulled out a gun and shot him in the leg. She identified defendant's photograph from a photo array.

Although the other witnesses at the scene did not see the shooting, they consistently reported, within hours of the shooting, that they heard a single shot. Only the defendant stated that he heard two shots as part of his effort to inculpate another anonymous shooter. Sarafinah Wharton confirmed that Whitlow stated she was not going to go with her husband because of the way he was acting. Dustin Sliker stated that a black male came to the residence and told Tyra to "come on," which confirms Whitlow's statement that defendant came to pick her up. Dustin Sliker further stated that after the man and Whitlow went outside, he heard a single gunshot. Karen Sliker, Ebony Wharton's mother, stated that Tyra's husband "Boo" came to the door, and Tyra went outside with him. The presentence report in defendant's drug case states that "Boo" is defendant's alias. Karen Sliker reported that Boo denied shooting Chandler, then ran out of the house.

The statements made by Amilcar during his police interview provide further corroboration for the statements of the other witnesses. Amilcar stated that a man known to him as "Blue" (which is phonetically close to "Boo") came to pick up Whitlow, who was the best friend of his girlfriend, Ebony Wharton, at the Leona Avenue residence. Amilcar stated that the two women had spent the day together. Whitlow said that she did not want to go with the man, and Amilcar stepped onto the front porch and relayed this to him. At that point, the man pulled out a gun and shot him once in

13

the leg. The fact that this interview occurred at 11:45 p.m. at the hospital emergency room where Amilcar was being treated suggests that Amilcar's statements were reliable. See Bryant, 462 U.S. at 368-69 (noting that statements by an injured victim may be "simply reflexive"). Amilcar was not able to identify his assailant when shown two photo arrays, but Detective Chapman testified that the photo of the defendant used in the array was fourteen years old. During his testimony at the hearing, Amilcar stated that he told Detective Chapman at the hospital that "Blue" shot him. He testified that he did not see the shooter in the courtroom. However, this testimony does not render his previous statements to Detective Chapman unreliable. See Dobson, 529 F.App'x at 539 (factfinder could plausibly conclude that victim's hospital statement, bolstered by other corroborating evidence, was sufficiently reliable, even if later recantation was not). Amilcar had good reason to fear retaliation by the defendant if he identified him in court as the shooter. Amilcar initially stated that he did not want to testify, and refused to come into the courtroom. It was only after he was advised of the possibility of being arrested for contempt of court that he agreed to testify. This provides some indication that Amilcar was afraid of the defendant. Therefore, the court does not credit Amilcar's denial that his assailant was in the courtroom as being reliable testimony.

The court concludes that the witness statements contained in Government's Exhibit 1, made shortly after a traumatic event, are both internally and externally consistent, and that these hearsay statements are reliable.

14

C. Statements Regarding Domestic Violence Charge

Statements by a victim of domestic violence may be reliable if made soon after the assault. Dobson, 529 F.App'x at 539 (statement not likely contrived when made under the stress of excitement from the assault); Martin, 382 F.3d at 846 (victim's state of mind added indicia of reliability where victim was excited and distressed when statements were made). In her statement to Officer Kenneth Shawver of the Bexley Police Department[1] made on May 4, 2015, around 2:34 a.m. at Ohio State University Hospital, Whitlow stated that she and the defendant went to Walmart around 10:00 p.m. to purchase milk and a board game. On the drive to defendant's house, Whitlow told him that she did not want to be with him anymore. The defendant became upset and poured Nair on her hair, grabbed her head, and slammed it into the dashboard twice. Defendant stated "I'm gonna kill us" and slammed into a parked car. He then drove the car to an apartment complex, and they walked back to his residence. Whitlow convinced defendant to take her to the hospital, then asked security to keep him away from her.

In her May 10, 2015, interview regarding the Amilcar shooting, Whitlow referred to the pending domestic case, consistently reporting that defendant poured Nair on her head and rammed her car into another vehicle. Whitlow gave another consistent statement regarding the May 3rd incident to Officer Boone on May 14, 2015. According to Officer Boone's report, Whitlow also stated that on the night in question, defendant asked her if she could stay the

---

[1] Although defendant objected to the use of Whitlow's hearsay statements, he did not otherwise object to the admissibility or authenticity of the Bexley police records.

15

night, and she declined.  After they arrived at Walmart, defendant disappeared inside the store, and Whitlow believed this is when defendant obtained the hair remover.  When Officer Boone spoke with Whitlow on June 12, 2015, she stated that what she had previously told him about the incident was true, but that she had decided not to pursue charges.  Thus, Whitlow stuck to her version of the incident and never recanted her previous statements.

    Whitlow's statement is also corroborated by physical evidence. Whitlow's physical injuries were consistent with her statement. Photographs taken of Whitlow at the hospital show that she had two abrasions and a lump on her forehead, a cut on her right arm, and a bald spot on the top of her head.  See Martin, 382 F.3d at 846 (hearsay was reliable where corroborated by objective medical evidence and physical injuries that were visible at the time).[2] The police report also includes photos of the damage to the rear driver's side bumper sustained by the parked vehicle in the hit-skip collision, tan car parts found at the location of the hit-skip collision, and photos of Whitlow's tan car with damage to the left front fender.  There is also a photo which shows a dribble of white cream and a dark stain on the passenger side dash board.  Officer Shawver's report indicates that he saw Nair on the passenger side of the vehicle, and blood was also found inside the vehicle.  The affidavit submitted in support of the application for a search warrant for the vehicle used by Whitlow states that blood was observed on the dashboard and a white cream was seen in the

---

    [2]This photographic evidence is nontestimonial and does not implicate confrontation rights.  See United States v. Beach, 196 F.App'x 205, 209 (4th Cir. 2006).

16

interior. The warrant return indicates that blood was removed from the passenger side dash board, and a white lotion was removed from the passenger side front door frame. This corroborates Whitlow's statement that defendant was driving and that she was sitting in the passenger seat when defendant poured Nair over her and banged her head against the dashboard.

At the hearing, defendant sought to impeach Whitlow's statements with evidence that she had previously been sentenced for a hit-skip offense. Defendant's line of questioning suggested the hypothesis that Whitlow was the driver of the car, but subsequently invented the story that defendant had been driving and had assaulted her to cover up her own involvement in another hit-skip offense. Defendant also submitted evidence that Whitlow was previously charged with domestic violence, specifically, pulling the hair of Demetrius Harris, the father of her child, a charge which was later dismissed. Defendant suggested that this is where Whitlow got the idea of accusing defendant of hair pulling. The court finds that this evidence is not sufficient to undermine the reliability of Whitlow's statements concerning the May 3rd incident. Defendant's theory that Whitlow was driving is not supported by any evidence other than a questionable similar acts inference. Defendant's theory also does not account for the use of Nair Hair Remover in this case. The photo showing a white liquid on the passenger side dashboard supports Whitlow's statement that she was in the passenger seat. Her statements that defendant poured Nair on her head, pulled her hair, and pushed her head into the dashboard are corroborated by police photos of a bald spot and abrasions on her head. It is unlikely that Whitlow would have

17

inflicted this type of physical damage on herself just to support a claim that defendant was the driver of the vehicle.

The court finds that police report and Whitlow's statements regarding the domestic violence constitute reliable hearsay.

IV. Balancing of Interests

Under Rule 32.1(b)(2)(C), this court is required to balance the defendant's interest in confronting the declarants against the government's good cause for denying confrontation. The court found above that the government demonstrated good cause for its failure to produce the declarants who witnessed the assault and domestic violence incidents at the hearing. The court also found that the witnesses' hearsay statements in the police reports are reliable, which diminishes any interest defendant has in confronting the declarants. Balancing these interests, the court concludes that the defendant's interest in confronting the declarants does not outweigh the government's interest in proceeding with reliable hearsay evidence in light of the witnesses' failure to appear and the government's inability to secure their testimony. The court determines pursuant to Rule 32.1(b)(2)(C) that the interest of justice does not require the appearance of these witnesses.

V. Findings on Violations

A district court may revoke a term of supervised release if it "finds by a preponderance of the evidence that the defendant violated a condition of supervised release." 18 U.S.C. §3583(e)(3). In light of defendant's admission that he failed to maintain employment since March, 2015, and had a positive urine screen for Oxycodone on February 26, 2015, the court finds by a preponderance of the evidence that these violations have been

established.  The court accepts the testimony of Officer Boone, and finds by a preponderance of the evidence that defendant failed to submit a monthly report for May, 2015, and failed to notify Officer Boone about his June 10, 2015, arrest for felonious assault within seventy-two hours.  Based on the reliable evidence discussed above, the court also finds by a preponderance of the evidence that defendant committed the offense of domestic violence against Whitlow on April 3-4, 2015, and that he committed the offense of felonious assault with a firearm against Amilcar on May 9, 2015.  A final revocation hearing for sentencing on these violations is scheduled on October 2, 2015, at 2:30 p.m.

Date: September 22, 2015            s/James L. Graham
                                 James L. Graham
                                 United States District Judge